1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Susan van Keulen, Magistrate Judge

4

5   MCLAUGHLIN, et al.,              )
                                     )
6            Plaintiffs,             )
                                     )
7   vs.                              )   No. C 22-07849-SVK
                                     )
8   TESLA, INC., et al.,             )
                                     )
9            Defendants.             )
    _____ )
10

11                                   San Jose, California
                                     Thursday, September 5, 2024
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
      RECORDING 10:00 - 12:05 and 12:15 - 12:16 = 126 MINUTES
14

15  APPEARANCES:

16  For Plaintiffs:
                                 Walkup, Melodia, Kelly and
17                                 Schoenberger
                                 650 California Street
18                               Twenty-Sixth Floor
                                 San Francisco, California
19                                 94108
                            BY:  ANDREW P. MCDEVITT, ESQ.
20

21  For Defendants:
                                 Dykema Gossett LLP
22                               444 South Flower Street
                                 Twenty-Second Floor
23                               Los Angeles, California 90071
                            BY:  JAMES M. GOLDEN, ESQ.
24

25                  (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
1  For Defendants:
2                          Nelson Mullins
                           1021 East Cary Street
                           Suite 2120
3                          Richmond, Virginia 28219
                      BY:  EDEN M. DARRELL, ESQ.
4

5  Transcribed by:         Echo Reporting, Inc.
                           Contracted Court Reporter/
6                          Transcriber
                           echoreporting@yahoo.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1  Thursday, September 5, 2024                    10:00 a.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                        --oOo--

4           THE CLERK:  Calling Case 22-CV-7849, McLaughlin,

5  et al., versus Tesla, Inc., et al.

6      Counsel, please identify yourselves for the record,

7  beginning with Plaintiff.

8           MR. MCDEVITT:  Good morning.  This is Andrew

9  McDevitt for Plaintiff.

10          THE COURT:  Mr. McDevitt, good morning.

11          MR. GOLDEN:  Good morning.  James Golden for

12  Tesla.

13          THE COURT:  Mr. Golden, hello.

14          MS. DARRELL:  Good morning.  Eden Darrell for

15  Tesla.

16          THE COURT:  Ms. Darrell.

17      All right.  I'm sorry, Counsel.  Can I get your

18  appearances again?  I don't have my calendar here in front

19  of me for some reason.

20          MR. MCDEVITT:  Yes, your Honor.  Andrew McDevitt

21  for the McLaughlin Plaintiff.

22          THE COURT:  Thank you.  Not that I don't remember

23  everyone's name, but I want to be sure.  Thank you.

24          MR. GOLDEN:  And James Golden.

25          THE COURT:  Golden.  Thank you.

4

1          MR. GOLDEN:  And this is the first time I've been

2  in court, your Honor.

3          THE COURT:  Yes, I am aware.

4          And, counsel?

5          MS. DARRELL:  Eden Darrell on behalf of Tesla.

6          THE COURT:  Darrell?

7          MS. DARRELL:  Yes.

8          THE COURT:  Thank you.  I apologize.  I have all

9  my pieces of paper but one.

10         MS. DARRELL:  (Indiscernible) print out?

11         THE COURT:  No, no, no.  No, no.  I got it now.

12     All right.  And you can remain seated and argue from

13  there if you want, or you can approach the podium.  Just be

14  sure you're using the microphones if you want to remain

15  seated, because we record these proceedings, and you can

16  request a transcript of the recordings, so we want to be

17  sure we don't miss anything.

18     All right.  I did issue a tentative order last week,

19  with tentative rulings, and I would like to start with the

20  choice of law motion brought by Tesla, and specifically on

21  the issues -- well, we should -- we can address it, the

22  issues that are raised.  There are really four.  They're not

23  all in that motion, but there's three issues raised in the

24  choice of law motion on whether product liability is

25  evaluated under negligence or strict liability.

5

1        The second issue is whether -- the availability of a
2   contributory negligence defense, as opposed to comparative
3   negligence under California law, and the third is whether or
4   not the Virginia cap on punitive cap on punitive damages in
5   the amount of $350,000 applies, as opposed to California
6   law, with no cap.
7        The fourth issue is whether or not Doctor Fratto
8   (phonetic) -- Fratto?
9            MR. GOLDEN:  Fratto, your Honor.
10            THE COURT:  Fratto.  Thank you.  Fratto, who is
11   not an MD -- whether he can testify as to causation.
12   Virginia has a state law that requires causation be
13   delivered by a medical doctor.  But that was in the Fratto
14   motion, but it all relates to which state's law will govern.
15        So you did see in my tentative, as to the three issues
16   in the choice of law motion, under a choice of law analysis,
17   as I'm required to exercise it here in California, my
18   tentative ruling is to grant Tesla's motion as to the three
19   actions, not as to the Fratto action, which we'll address.
20   Let's just put that one at the end of the choice of law
21   issues.
22        All right.  So, given my tentative, Mr. Golden, would
23   you like to be heard first, or can I go ahead and hear from
24   Mr. McDevitt?
25            MR. GOLDEN:  I would like to be heard, your Honor.

6

1          THE COURT:  All right.

2          MR. GOLDEN:  We do, obviously, agree with the

3  tentative ruling as to the three items.  We would request

4  only that -- and this may be a clarification, or it may be

5  just something that we'd like to argue -- that the ruling be

6  made so that Virginia's products liability law is found to

7  govern all of Plaintiffs' causes of action and claims for

8  damages.  That's the approach that has been taken in the

9  California courts, such as the <u>Chen</u> (phonetic) case that we

10 cited in our briefs.

11      In that case, the complaint pled causes of action for

12 wrongful death, negligence, strict products liability, loss

13 of consortium, and negligent infliction of emotional

14 distress.  The trial court, after going through the

15 governmental interest test, determined that Indiana law

16 governed, quote, "the case," unquote -- close quote, excuse

17 me -- and the California Court of Appeal ultimately affirmed

18 the ruling that Indiana products liability law applied to

19 the case.

20      In our case, the Plaintiff has four causes of action,

21 therefore, strict liability, negligence, post-sale

22 negligence, and loss of consortium, but all of them are

23 premised on the allegation that the Model Three was

24 defective.  It's a defective product case.  And so, just

25 like in the <u>Chen</u> case, Virginia strict products liability

7

1  law, and Virginia negligence law and damages law, should

2  govern all of those causes of action.

3      So our case isn't one where there's tort and contract

4  claims, where it might be necessary to go through the

5  governmental interest analysis differently for the different

6  causes of action.  Instead, it's like <u>Chen</u>, where all the

7  causes of action are based upon a design defect.

8      So we request that the Court rule that Virginia

9  products liability law governs all of Plaintiffs' causes of

10  action, and that Virginia law governs Plaintiffs' claim for

11  damages, and then any remaining issues -- because we agree

12  that we need to go issue by issue -- any remaining issues,

13  we could set up a briefing schedule to analyze further

14  anything that might remain after that.

15          THE COURT:  So your concern is that the Court not

16  rule too narrowly?  Is that your concern?

17          MR. GOLDEN:  Yes.  My concern is, so that we have

18  the guidance to prepare for trial, that the ruling be found

19  to apply to -- that Virginia products liability law, not

20  California products liability law, applies in this action,

21  and the same for damages.

22      For all other issues, like, for example, the recall,

23  which your Honor, on that motion in limine, explained should

24  be handled in a motion in limine -- and we don't dispute

25  that.  We'll handle it that way, as a motion in limine, but

8

1  there might need to be a choice of law analysis done for

2  that.  It would be separate from whether Virginia products

3  liability law governs or not, but, in terms of what

4  substantive law is governing the causes of action, since

5  they're all causes of action for product defect, it should

6  be Virginia products liability law that governs.

7            THE COURT:  Okay.  I see the logic of your

8  argument as to the claims in the case for strict liability,

9  negligence, and post-sale negligence, because that's the

10 determination we're making between which products liability

11 scheme, and the loss of consortium I have to give some

12 though to --

13            MR. GOLDEN:  Okay.  And we'd be happy --

14            THE COURT:  -- but I understand the argument.

15            MR. GOLDEN:  We'd be happy to brief that, if

16 necessary.  I would just say, since Ms. McLaughlin -- and I

17 hope I have the name right, but Ms. McLaughlin is the --

18            THE COURT:  Clark (phonetic), I think, is the --

19 does she go by either?

20            MR. MCDEVITT:  Yes.

21            THE COURT:  All right.

22            MR. GOLDEN:  Okay.  She's in Virginia, and so any

23 loss of consortium, it would make sense, would be Virginia

24 law would govern that, for all the same reasons that it

25 governs the product defect claim, and California wouldn't

9

1  have any interest in compensating Ms. McLaughlin, or Ms.

2  Clark, for any loss of consortium.  So we'd argue Virginia

3  law governs that as well --

4           THE COURT:  I understand.

5           MR. GOLDEN:  -- but we'd be happy to brief it, if

6  that's your Honor's preference.

7           THE COURT:  I understand.  All right.

8      Mr. McDevitt, on the choice of law issues, please --

9  or, excuse me, the products liability scheme, the first

10  issue.

11          MR. MCDEVITT:  Sure.  So just first addressing Mr.

12  Golden's comments a moment ago, I think that, under the

13  choice of law analysis, as the Court points out with respect

14  to Doctor Fratto, I think it needs to be more narrow than --

15  frankly, I'm not sure what the implications of what Mr.

16  Golden is saying.

17      I presume there are some things that would be

18  preferable to them, but I think it's not appropriate,

19  actually, to make that sweeping ruling, because, as the

20  Court notes, the Court has to go through the choice of law

21  analysis for the discrete issues, and the default is that

22  the law of the forum where the dicta action filed applies,

23  and it's -- the party that wants a different law to apply,

24  it's their burden to prove to the Court that a different law

25  should apply, which requires, as the Court knows, that the

10

1  differences first be identified, so that the Court knows,

2  are there differences?  And then the subsequent stuff can be

3  evaluated.

4      So I don't -- I guess I wouldn't agree with a sweeping

5  blanket comment that the strict products liability laws

6  apply, because it's not even clear what that's talking

7  about.  Are we now shifting to negligence?  Well, to what

8  extent does the law regarding negligent products differ by

9  state, and post-sale negligence in particular?  So I think

10 it needs to be a more discrete analysis, frankly, because

11 I'm myself concerned.  I'm not sure exactly what you're

12 referring to.

13         THE COURT:  Okay.  All right.  That's helpful.

14 Thank you.  Remind me, Mr. McDevitt.  The post-sale

15 negligence, what's the basis?  What are the factual bases

16 for that claim?  I'm just not -- I'm not remembering off the

17 top of my --

18         MR. MCDEVITT:  So, in this case, your Honor, the

19 theory generally relates to a (indiscernible) where owners,

20 users of Teslas, believe that they are in one mode, where

21 they believed the steering, automatic steering, is engaged,

22 when, in reality, only the speed control is engaged, and,

23 therefore, when there's a curve in the road, a bend in the

24 road, the person in the seat is expecting the vehicle to

25 steer consistent with auto-steer being engaged, but it

11

1  doesn't, and we've learned from discovery that that has led

2  to ███████████████ .

3      And so the post-sale negligence here would relate to

4  the time period between when Mr. McLaughlin received his

5  Tesla Model Three and the collision.  We have, through

6  discovery, found evidence that Tesla was ██████████████

7  ████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████

9  ██████████████████       Part of our post-sale negligence claim

10  is that it was unreasonable for Tesla to have not made

11  changes to the software in that interim period, which would,

12  from Plaintiffs' position, have prevented this collision.

13          THE COURT:  All right.  Thank you.  That's

14  helpful.  Okay.

15      Other argument, Mr. McDevitt, with regards to the

16  Court's decision to apply the products liability regime of

17  Virginia, as opposed to California's strict liability, as

18  reflected in my tentative ruling, setting aside the swooping

19  nature that counsel has asked for here today?

20          MR. MCDEVITT:  Sure.  So, your Honor, so I read

21  the tentative, and the tentative itself didn't, at least for

22  me, help me understand the rationale of the Court's

23  decision.  I'm mindful of the Court's preliminary statement,

24  and not for repeat anything (sic), or not just to recite the

25  brief again.

1        THE COURT:  Sure, sure, sure.

2        MR. MCDEVITT:  However, on this issue, the defense

3  relies primarily on what has been referred to now as the

4  "Chen Two" decision, and under the Chen Two decision, the

5  defense position is that there is -- well, first, on step

6  one, there's an agreement that there's differences, right?

7        THE COURT:  I think that's pretty clear.

8        MR. MCDEVITT:  Yes.  And then step two is

9  whether -- you know, what is each jurisdiction's interest in

10 application of its own law under the circumstances of the

11 particular case?

12        THE COURT:  Right.

13        MR. MCDEVITT:  So it's very -- as the cases make

14 clear, it's a case-specific analysis --

15        THE COURT:  Correct.

16        MR. MCDEVITT:  -- and the Chen Two decision,

17 respectfully, does not support Tesla's position here.  In

18 Chen Two, we have Plaintiffs that were not from Indiana.

19 They were from China.  And we have a crash that was not in

20 Indiana.  It was in Arizona.  And then the activity that

21 occurred in Indiana is more analogous here to what Tesla did

22 in California.

23    At all times -- and, your Honor, the Defendant that was

24 from Indiana, for which the Court determined that law to

25 apply, was the designer, manufacturer, and distributor of

13

1  the van that was involved, or the bus that was involved in

2  the collision, and the decision says that Indiana has an

3  interest because the Defendant resides in Indiana.

4      Here, at all times prior to the collision, Tesla had

5  its headquarters in California.  All of the design work was

6  done in California.  The engineers were in California.  The

7  vehicle was built in California, and to the extent Tesla was

8  updating the vehicle's software, as it does through the life

9  of its vehicles, all of that was done in California.

10      I'm mindful of the Court's comments in <u>Chen Two</u> about

11  the interest being hypothetical because, at page --

12  specifically at page 498, California's interest becomes

13  hypothetical because the injured persons were not California

14  residents and were not injured in California, but that

15  simply cannot be the case, and the Court there did not talk

16  about some of the authority that we identified in our

17  opposition, in particular the <u>Stangvik</u> case, <u>v. Shiley</u>, a

18  1991 case, which is a California Supreme Court case, 54

19  Cal.3d 744, at 759, where it says, quote:

20          "California has a strong interest in

21          regulating the conduct of manufacturers

22          who produce products in this state which

23          cause injury to persons in other

24          jurisdictions."

25      And that's the California Supreme Court, which, in the

14

1  Court's analysis, ought to trump the appellate court, and in

2  the reply papers, the defense comments that, you know, maybe

3  the circumstances there were different or the posture of the

4  case was different, but that doesn't change that that is an

5  accurate statement from the California Supreme Court.  There

6  is an interest for California to regulate the conduct of --

7        THE COURT:  To be sure, and that's step two,

8  right, which is "Is there an interest?"

9        MR. MCDEVITT:  Yes.

10       THE COURT:  It's when we get to step three, where

11 we're trying to figure out which interests are most

12 impaired, the interests of which state are more impaired,

13 that I think is the decisive step.  I think we get through

14 step one and step two as to all of these issues, and it

15 really comes down to step three.

16     An issue with <u>Stangvik</u> is it's not a choice of law

17 case.  It's acknowledging California has an interest.  It's

18 manufactured here, designed here, all exactly the points

19 that you've pointed out, but it's not choice of law.  It

20 doesn't get us to step three, as to how that interest might

21 compare when you have an out-of-state resident and an

22 out-of-state accident.

23       MR. MCDEVITT:  Understood, and thank you, your

24 Honor.  I didn't know if the Court had got -- where the

25 Court's tentative --

15

1    THE COURT:  No, I know.  I didn't lay out all the
2  musing, because, frankly, we've been continuing to kind of
3  work, and work our way through it.
4    MR. MCDEVITT:  Okay.  So, as to step three,
5  California's interest in -- I think that is consistent with
6  what the statement is saying (indiscernible), that that
7  relates to California's interest in regulating the conduct
8  of its manufacturers who produce products in the state, and
9  if Virginia laws apply, then it is -- California has a
10  strong interest in encouraging manufacturers to make safe
11  products, not only for California residents, for persons
12  outside of California, and if Virginia's laws apply, it cuts
13  against that interest and that policy goal, whereas, on the
14  Virginia side, even looking at Chen Two, the Court talks
15  about, well, the interest for Indiana in having a more
16  restricted products liability scheme was to protect in-state
17  resident manufacturers and designers.  So, to the extent a
18  state has a policy that is more restrictive on strict
19  liability, in other words, you have the additional
20  negligence that you don't have with the (indiscernible)
21  test.
22    THE COURT:  Right.
23    MR. MCDEVITT:  That is the state's interest in
24  protecting its own in-state resident competence, but that's
25  not Tesla.  Tesla was, again, headquartered in California,

16

1  so it would be -- really, the logic that the Court describes

2  with respect to Indiana's interest in <u>Chen Two</u> is the

3  interest that California has for Tesla in this case.

4         THE COURT:  But are you overlooking a Virginia

5  interest in attracting business into that state and having a

6  policy, a law, a statutory framework, that reflects a policy

7  of encouraging business in the state?

8         MR. MCDEVITT:  I would say no, your Honor,

9  because, again, the (indiscernible) fact-specific, and that

10 would be a hypothetical.  I mean, that would be a

11 hypothetical interest, I guess, if we're using that phrasing

12 for (indiscernible).

13        THE COURT:  What if, I mean, the car was purchased

14 in Virginia?

15        MR. MCDEVITT:  It was --

16        THE COURT:  I mean, Tesla is doing business in

17 Virginia.

18        MR. MCDEVITT:  They have one dealership in

19 Virginia, and, in fact, Tesla was trying to kind of disrupt

20 the industry.  They were not trying to comply with Virginia

21 law by using the Virginia dealerships.  In fact, they were

22 trying to disrupt it and not bring business to the state.

23        And here none of the -- at no point has Tesla had

24 any (indiscernible) court case in the record.  There's no

25 evidence of any engineers in Virginia.  There no evidence of

17

1  any design work done in Virginia.  There's no evidence that

2  that policy interest in Virginia for in-state residents,

3  manufacturers, designers is being affected at all, because,

4  in this case, and (indiscernible) case, Tesla was never

5  there, and so their interest -- and there's not any --

6  there's no evidence in the record that Tesla was selective

7  in selling vehicles only in particular states based on, you

8  know, the products liability regime in that state, or that

9  they were more attracted to states that had a particular

10  product liability regime.  There's not any evidence that

11  that particular interest that Virginia has is in any way

12  implicated here.

13          THE COURT:  All right.  If I understand your

14  argument on this point, Mr. McDevitt, it's that when we get

15  to step three, that the California interest in holding its

16  manufacturers and designers in-state accountable would be

17  more impaired than Virginia's interest when we're looking at

18  the strict liability versus negligence scheme.

19          MR. MCDEVITT:  Yes, your Honor.  I mean, at

20  some -- I think -- an analogy I thought of on the way here

21  is, it would be like saying, you know, a company that

22  manufactures, you know, a blender that blows up in Nevada --

23  you know, California would not have -- you know, if it was

24  manufactured and designed in California, California would

25  say, "Well, we don't care about that.  It only injured

18

1    somebody in Nevada."

2        That's not consistent with the case law in California

3    and the California Supreme Court statements about the

4    interests that California has in regulating companies that

5    design, manufacture, distribute products from the state.

6    California's interest is in ensuring that the products are

7    safe, so that persons are not unnecessarily injured both in

8    California and out of California, and we cite to some

9    authority referencing that on page three of our opposition.

10            THE COURT:  And, again, I just -- the -- what has

11    to be navigated here is the acknowledgment of an interest,

12    at step two of the analysis, and then comparing those

13    interests at step three, but I understand your argument, and

14    it you've made the point that, from your perspective,

15    California's interests would be paramount.

16            MR. MCDEVITT:  And I guess my point, your Honor,

17    in trying to kind of wade through Chen Two and understand

18    the Court's rationale, if nothing else, the focus was on --

19    to the extent -- the focus was on the resident defendant

20    manufacturers, and that's why the Court was talking about

21    Indiana in rejecting the notion that Indiana didn't have an

22    interest, and the Court rejected it saying, "Of course they

23    have an interest."  It is an in-state resident, in fact,

24    whereas here Tesla isn't -- you know, the only connection

25    they have to Virginia in this case is through the sale of

19

1  the vehicle.  In that -- in <u>Chen Two</u>, that was the interest

2  that California had.

3          THE COURT:  No, I understand.

4          MR. MCDEVITT:  And so -- and that's what the

5  Court -- the Court said -- well, frankly, there's not much

6  discussion of that, but I guess, by its omission, the Court

7  determined it was not of any significance.

8          THE COURT:  Got it.  Thank you.

9      Mr. Golden, a brief response --

10         MR. GOLDEN:  Thank you.

11         THE COURT:  -- on this point?

12         MR. GOLDEN:  First, we have a disagreement about

13 step two, but that's covered in the briefing, so I won't

14 repeat all of the argument on step two.

15     On step three, I think Mr. McDevitt is really

16 understating the connection of Virginia to the case.  First,

17 he's focused only on Tesla's conduct, but overlooking the

18 Plaintiff's conduct is at issue as well, and California

19 cases say that states where the accident occurred have a

20 presumptive interest in regulating the conduct of those who

21 use the roads, and Mr. McLaughlin was using the roads in

22 Virginia, and we have argued, and will continue to argue,

23 that he was very negligent in how he operated the vehicle.

24 So that's a big interest that Mr. McDevitt has not even

25 discussed.

20

1          When it comes to Tesla, the car was purchased in

2    Virginia, at a Tesla dealership, where people work that were

3    employed by Tesla.  The accident, the crash, everything

4    happened in Virginia.  The California Supreme Court, in

5    McCann (phonetic), has expressly said that it's not about in

6    state versus out of state, which is the distinction that Mr.

7    McDevitt was trying to make.  Even states have an interest

8    in attracting out-of-state companies to do business, to get

9    revenue, but also to make products available to their

10   residents to purchase, and that interest is impaired if

11   California strict products liability law is applied in this

12   case.

13         As your Honor pointed out, the statements in the

14   California Supreme Court Shiley case, that's forum

15   non-convenience.  It's not a choice of law analysis, and

16   they're very different frameworks, because forum

17   non-convenience is a discretionary issue about whether it's

18   more convenient for the case to be tried.  Choice of law is

19   a legal analysis that the Court undertakes to determine what

20   law should govern issues in the case.

21         Moreover, as your Honor pointed out in the tentative,

22   you have to look at it issue by issue, and in this case, we

23   have a tort claim that's being brought, and the purpose of

24   tort law is to compensate Flaintiffs for their injuries.

25   It's not about regulating manufacturers.  There's all kinds

21

1  of ways California --

2        THE COURT:  Well, some tort law is about that,

3  regulating manufacturers.

4        MR. GOLDEN:  To the extent there's an overlap

5  between compensating the Plaintiff and regulating

6  manufacturers, I agree, your Honor, but that's -- it's an

7  overlap rather than, like, the primary purpose of the law.

8  And so here we have a Virginia resident, and, going back to

9  Chen Two, California's interest is hypothetical when you

10  have an out-of-state resident who's injured out of state.

11      Going to Chen Two, Mr. McDevitt is overlooking the fact

12  that there was a California defendant in the case who was --

13  the claim was they bought a (indiscernible) that didn't have

14  seatbelts on it. So there was alleged wrongful conduct in

15  California, just the way Plaintiffs in our case are alleging

16  that there was wrongful conduct in California, but that was

17  not enough to overcome the fact that there were no

18  California Plaintiffs, and they were not injured in

19  California.

20      So, again, we know from McCann that Virginia has

21  legitimate interests in applying its law to out-of-state

22  companies that do business within the state.  We know from

23  other California cases that Virginia has the presumptive

24  interest in regulating the conduct of those that use its

25  roads, and Virginia has the predominant interest in

22

1   compensating its residents for injuries that were allegedly

2   sustained there.

3        So, on step three, Virginia's interests would be far

4   more impaired.  California's interest is hypothetical, and

5   any minor overlap between the regulating manufacturers and

6   compensating victims is not enough to overcome the interests

7   that Virginia has.

8             THE COURT:  All right.  Thank you.  Okay.

9        Let's move to the next choice of law issue, the

10  availability of contributory negligence versus comparative

11  negligence.  The arguments may be much the same, but, if

12  there is a distinction at either step two or three, tell me

13  what that is.

14            Mr. McDevitt.

15            MR. MCDEVITT:  Your Honor, so I think, in the

16  cases, again, the focus is on, in the particular case, the

17  resident defendants, and the damages caps are for protecting

18  resident defendant.  Presumably, it's not to punish resident

19  plaintiffs, and the, you know, contributory negligence

20  scheme, again, would be to protect resident defendants, and,

21  your Honor, applying California's scheme doesn't impair

22  that, because the California scheme is not an inherently

23  unfair scheme.  It's a scheme that apportions fault

24  according to how the jury decides the fault should be

25  apportioned.  It's an equitable scheme.

1    The contributory negligence scheme is an inequitable

2  scheme that is slanted toward protecting the defendant.  If

3  you have a one percent -- you know, 99 fault of the

4  defendant, one percent on the plaintiff, you get nothing.

5  That is for protecting resident defendants.

6        THE COURT:  That's probably why there's only four

7  states that still have contributory negligence.

8        MR. MCDEVITT:  Yes.  And so, your Honor, I would

9  say that our position is, California's scheme does not

10  impair the interests of Virginia.  In fact, it applies what

11  the vast majorities of states have found to be an equitable

12  way of apportioning fault, and the only interest that could

13  be a focus of those laws would be to protect resident

14  defendants, and there is no resident defendant in this case,

15  in California.  Again, your Honor, Tesla is in California.

16    And I guess, to come back to the last -- or one point

17  Mr. Golden made about the wrongful conduct in California in

18  Chen Two -- again, that was the conduct that would be

19  analogous to what Tesla did in Virginia here, which was

20  simply selling the vehicle, and the Court found far more

21  import in the fact that the design, manufacture, and all

22  that were done in Indiana.  So, with respect to that point,

23  I think, actually, Chen Two favors Plaintiff, your Honor.

24    And then, lastly, your Honor, just referring to the

25  page seven of Plaintiff's opposition in the Wright v.

24

1   <u>Purcell</u> (phonetic), a California Supreme Court case where

2   the California Supreme Court held that Missouri's statute

3   capping damages did not apply, because the local interest in

4   protecting residents from (indiscernible) damages did not

5   extent to non-resident defendants.

6       And I recognize in that case that you have two parties

7   from out of state, but I think the point, your Honor, is

8   that the damages caps are in place for the purpose of

9   protecting resident defendants, and, again, this is a

10  fact -- a specific analysis that we don't have a resident

11  defendant here.

12          THE COURT:  But we have a defendant doing business

13  in Virginia.

14          MR. MCDEVITT:  Correct, but understanding, too,

15  that that was -- again, coming back to <u>Chen Two</u>, with the

16  company that distributed from California, that was given

17  very little weight.  The overall -- and, in fact, that's why

18  California law didn't -- a court found that it didn't apply

19  there, because there was very little activity in the state,

20  and the more -- the vastly more important activity was the

21  conduct that resulted in, under Plaintiff's theory, the

22  harm, which is the design -- well, I take that back.  There

23  was criticism of them not selecting seatbelts, the lap belt

24  and shoulder belt.  The California distributor, under

25  plaintiff's theory in <u>Chen Two</u>, had the option of --

1          THE COURT:  Right.

2          MR. MCDEVITT:  -- it with them.  However, the

3   initial decision as to make those seatbelts standard would

4   have been done in Indiana.

5          THE COURT:  What about, Mr. McDevitt -- I think a

6   challenge in this analysis is <u>McCann</u>, in the <u>McCann</u> case,

7   where it appears that the California courts have taken a

8   very restrained few on the reach of California law, again,

9   when the -- on imposing liability for conduct that occurs

10  outside the state, and, again, we have the accident is in

11  another state, and the Plaintiff is from another state.

12         MR. MCDEVITT:  So here, your Honor, I would say

13  that, actually, when we're talking about the conduct of

14  Tesla, in this case, because of the nature of the company

15  and the technology that they have, the conduct was ongoing.

16  It wasn't just designing the vehicle and the autopilot

17  software, and then shipping it out of state.  Tesla, on

18  about a monthly basis, is the regular cadence for it, is

19  issuing updates to the software.

20      So they are changing the way the software works, and,

21  in fact, when they ultimately did a recall on the vehicle,

22  that was done through a software update.  So their conduct

23  was ongoing in California all the way up until Mr.

24  McLaughlin received the last update to his software before

25  the crash, which I think was -- within a month of the crash,

1 he had received another update.

2      And, obviously, our focus is on Tesla's conduct, and

3 that conduct was all in California, and it was -- the

4 software updates made it ongoing conduct that occurred up

5 until and through the date of the collision, because our

6 position would be that they had at every moment in time --

7 just because of their technology, they can decided, "We're

8 going to deploy a software update to all of our vehicles,

9 and it can fundamentally change the way the vehicles

10 operate," and they were going that consistently

11 throughout -- you know, up until the time of the crash.

12      So the conduct would -- from Tesla's -- or from the

13 vantage point of looking at Tesla, although the effect of

14 the conduct ended up being in the vehicle in Virginia, all

15 of their conduct is originating in California throughout the

16 period of injury.

17           THE COURT:  I don't see that -- I appreciate the

18 argument.  I don't see the support for that in the record

19 before me, in the briefs or declarations filed in opposition

20 to this motion.

21           MR. MCDEVITT:  As to which particular aspect, your

22 Honor?

23           THE COURT:  Just this point about ongoing conduct

24 as a factor that goes to -- it sounds like you're arguing to

25 step three, in that there's an ongoing interest in the state

1  of California.

2       MR. MCDEVITT:  Yes.  And, your Honor, as I --

3  actually, this relates back to one of the first issues we

4  discussed, which was the post-sale negligence, and that --

5       THE COURT:  As I understand your --

6       MR. MCDEVITT:  -- actually, indirectly, they're

7  likely -- it's in the record, evidence of that, probably,

8  with the other motion, with Doctor Andre (phonetic).  I

9  (indiscernible) your report talking about the updates they

10 made, the direct evidence of that from the deposition

11 testimony, which we do have, (indiscernible) not attached to

12 it.

13      THE COURT:  I didn't see this argument in the

14 brief.  I just want to --

15      MR. MCDEVITT:  Yes, your Honor.

16      THE COURT:  I mean, this is your chance to tell me

17 I overlooked it, if I did.

18      MR. MCDEVITT:  No.  I don't think that is

19 (indiscernible).

20      THE COURT:  Okay.  And the argument that you're

21 positing today, again, as I understand it just now, is that

22 there's ongoing conduct by Tesla.  As you say, it's not "We

23 design and build a car, and we ship it to another

24 jurisdiction," but "We are" -- "Our conduct in California is

25 continuing that impacts how the car operates," and that

28

1 somehow that impacts -- your argument is that that impacts

2 the -- or skews the step three analysis.

3        MR. MCDEVITT:  To the extent that the focus is on

4 where -- the tortious, and where this tortious conduct

5 occurred, I think, yes, your Honor, and it's -- yes, I think

6 you've understood my argument.

7        THE COURT:  Okay.  Mr. Golden.

8        MR. GOLDEN:  We're on the second of the items,

9 which is comparative negligence, which is contributory

10 negligence, and that is about the Plaintiff's conduct, and

11 only the Plaintiff's conduct, and only the Plaintiff's

12 conduct.  Argument about -- that Mr. McDevitt just made

13 about ongoing alleged tortious conduct has nothing to do

14 with whether Plaintiff's conduct was also negligent, and, if

15 so, how much of the recovery should be reduced or eliminated

16 based upon his own tortious conduct.

17    On step two, I don't think we get past step two,

18 because California doesn't have any interest in regulating

19 the conduct of Mr. McLaughlin, and Mr. McLaughlin's use of

20 the highways, and his negligent use of the highways in

21 Virginia.  Now, only Virginia can have an interest in that.

22 So we don't even get past step two on the comparative

23 negligence front.

24    Going on to step three, I agree with your Honor that

25 the analysis is going to be largely the same as for the

29

1  first of the big issues we're discussing today, except,

2  again, California cases say that the state where the

3  accident occurred has the presumptive interest in regulating

4  the conduct of those that use the roads, and since we're

5  talking about comparative negligence, that's what we're

6  talking about on this point.

7      Mr. McDevitt's comments at the beginning of his

8  argument about whether it's more or less equitable to have

9  comparative negligence goes only to the merits of the

10  policy, which your Honor is not allowed to look into under

11  California law.  It doesn't matter if we think Virginia is

12  wrong or if we think Virginia is right.  All that matters is

13  whether Virginia has the interest.

14      And I also would point out, again, since we're talking

15  about negligence, that Mr. McLaughlin chose to go to live in

16  Virginia.  He's a Virginia resident, and so he's exposed

17  himself to the risk that his claim would be decided using

18  Virginia's contributory negligence law, and that's a

19  California Supreme Court decision that we cited in our reply

20  brief, Offshore Rental Company:

21          "By entering Louisiana, Plaintiff

22          exposed itself to the risks of the

23          territory, and should not expect to

24          subject Defendant to a financial hazard

25          that Louisiana had not created."

30

1     Last point on this, although I don't think it's
2   relevant for negligence, is that the car was serviced in
3   Virginia.  This point about the update happening before the
4   accident, from California, there's no allegation of that,
5   and it has nothing to do with this case.  So it doesn't
6   matter for that reason as well, but I don't think your Honor
7   even needs to get into that when we're talking about
8   comparative negligence.
9       Sorry.  I said that was my last point, but there was
10  talk about the damages cap.  To me, that would be an
11  argument that would go to punitive damages, so I'd like
12  to --
13            THE COURT:  We're going there next.
14            MR. GOLDEN:  Okay.  So I'm just going to respond
15  to what he said (indiscernible), if that's okay.
16            THE COURT:  Sure.  You want to respond now?  I'm
17  sorry.
18            MR. GOLDEN:  I can respond now, or I would --
19            THE COURT:  Let's hear from Mr. McDevitt.
20            MR. GOLDEN:  Okay.  Yes.
21            THE COURT:  I'm trying to go in order, and the
22  third choice of law issue that has been identified by Tesla,
23  which is that Virginia's cap on punitive damages of $350,000
24  should apply in this case.
25            MR. MCDEVITT:  Your Honor, not to necessarily

1 repeat myself, but I think that's going to be similar to the

2 arguments that I made with respect to the (indiscernible)

3 issue, that the cap on punitive damages is for the purposes

4 of protecting a resident defendant, and here -- and, in

5 fact -- and that's what -- in the Chen Two case, what the

6 Court talks about with respect to (indiscernible) three.

7 The Court says, quote:

8          "Under these circumstances, Indiana's

9          interest in providing a

10         business-friendly environment that

11         protects its resident manufacturers from

12         excessive financial burdens is more

13         compelling than California's interest in

14         applying its products liability law."

15    Again, here, there is -- essentially, there's an

16 interest in providing a more business-friendly atmosphere

17 that protects resident defendants.  That doesn't apply here,

18 because Tesla was not a resident of Virginia, and the McCann

19 case talks about, you know, which jurisdiction should be

20 allocated predominant (indiscernible) under the

21 circumstances of the (indiscernible) case.

22    Here it doesn't make sense that, under the second

23 choice of law issue we compared, it involved essentially --

24 applying Virginia law is equivalent to almost giving Tesla a

25 free pass, no matter how bad their product is, no matter how

32

1  defective it is.  As long as there's some eighth percentage

2  fault on a plaintiff, they get, effectively, immunity, and

3  so that is about protecting resident defendants.

4      Same thing with the punitive damages.  It's only about

5  protecting resident defendants, and Virginia does not have

6  an interest in protecting a California company from punitive

7  damages.  In fact, a (indiscernible) would be that that's an

8  over-extension of Virginia's law, by protecting a company

9  for a product that was not in state, and the company doesn't

10  reside in the state.

11        THE COURT:  All right.  Thank you.

12     Mr. Golden, briefly.

13        MR. GOLDEN:  The Virginia interest in the punitive

14  damages cap is not just about protecting in-state companies.

15  The Fourth Circuit Opinion that we cited in our briefing,

16  Wackenhut (phonetic), states what the government interest

17  is.  In that case, the Fourth Circuit said, quote:

18            "Here the government's purpose was to

19            limit the jury's discretion in the

20            awarding of punitive damages.  Its goal

21            was to limit juries' punitive damages

22            awards to those that punish and deter,

23            and to prevent awards that burden the

24            states' economy."

25            Virginia has a legitimate interest in deciding the

33

1 appropriate level of deterrence and punishment for
2 out-of-state companies when the case involves a person who's
3 in Virginia, purchased a car in Virginia, and was allegedly
4 injured in Virginia, and all of the interests that are
5 identified in <u>McCann</u>, they also all apply here.

6 Obviously, if you allowed a $1,000,000,000 punitive
7 damages award, just to make up a number, that would greatly
8 impact the ability of the Defendant to sell products in the
9 state.  So Virginia has an interest in deciding what the
10 appropriate level of deterrence is, and the the appropriate
11 level of a need to punish Tesla, and the Virginia DMV allows
12 the sales of Tesla in Virginia, through Tesla dealers, and
13 so those are Tesla dealerships that are actually in state,
14 and so that, again, is all implicated by the punitive
15 damages count.

16 THE COURT:  All right.  Thank you.

17 MR. GOLDEN:  And then the point about the free
18 pass that Mr. McDevitt said Defendants would get is again
19 going to merits of the law.

20 THE COURT:  Understood.  Understood.  Thank you,
21 Mr. Golden.

22 All right.  Thank you for that.  I'm continuing to work
23 my way through that.  My objective is to -- we're going to
24 hear argument today, and I may, on our <u>Daubert</u> motions, make
25 some rulings from the bench, but, in any event, you will --

34

1    may or may not, I should say -- but I'm going to issue

2    orders on these, so your record is clear and my record is

3    clear.

4        I find that that is most helpful, especially when we're

5    going through trial, so we have the orders to refer back to,

6    and I will do that in the very near term, because I want you

7    to have those orders as you prepare your pre-trial briefing,

8    and those material and due dates are coming up.  So that's,

9    you know, in broad brush strokes, how I'm looking to

10   proceed.

11       So let's turn to the choice of law issue as it relates

12   to Doctor Fratto -- Fratto, sorry -- and then going to the

13   other Fratto issues that are presented.  So let's do it this

14   way.  Let's start with Tesla's challenge that Doctor Fratto

15   cannot testify because he is not an MD, and let me make it

16   clear.

17       I understand that there -- I mean, I've obviously been

18   through all of the arguments with respect to Doctor Fratto.

19   So there's this "Does Virginia law apply?," which would

20   close the door on him, or, if not, then we have these other

21   702 arguments, essentially, and we'll get to those.  This is

22   really another choice of law argument.

23       In my tentative, I may have unwittingly given you a

24   little bit of misdirection, and I didn't mean to -- I was

25   reading through it this morning -- which is, I mean, the

35

1  parties did not really unpack choice of law as it relates to

2  this issue.  You pretty much said, "See argument over

3  there."  And so we need the -- I want to hear from both

4  sides as to how that would apply here.

5      It's not the three-part <u>Chen</u> test, as I think I cited

6  and dropped in my tentative.  It's a 702, six -- it's a 601,

7  702 argument.  So it's -- you know, we start with 601, and

8  what's the rule of the forum?  And my thinking on this point

9  is, to elaborate on what was not in my tentative, is that,

10 under 601, we defer to the law of the -- let me get the

11 language right, because I think it's perhaps not the

12 clearest rule in the Federal Rules of Evidence:

13             "Every person is competent unless these

14             rules provide otherwise.  In a civil

15             case, state law governs the witness'

16             competency regarding a claim or defense

17             for which state law supplies the rule of

18             decision."

19      And here, as I read that, we're talking about

20 competency, and in California that we apply the -- for a

21 Court in California, we're going to apply California law.

22 It's a procedural issue.  We're in federal court.  It's a

23 procedural issue, not a substantive issue, so we're going to

24 apply California law to this issue, and that, in very

25 abbreviated form, is how I reasoned through this.

36

1    So I think that the Virginia restriction does not apply

2 in this case, and that Doctor Fratto can testify as to

3 causation, and we'll get to the other arguments about

4 limitations that are raised in the motion in a moment, but,

5 on the choice of law issue, Mr. Golden, did you want to be

6 heard?

7          MR. GOLDEN:  Yes, your Honor.  I think there are

8 three steps that we need to take.  The first is, what does

9 the language of 601 say about the issue?  The second,

10 assuming that it says it should be the forums choice of law

11 rules govern, is this a procedural rule or a substantive

12 rule?  And then, third, if it's a substantive rule, what

13 does the governmental interest test say about how it should

14 be resolved?

15    So, first, on the language of the rule, the rule says

16 state law governs the witness' competency regarding a claim

17 or defense for which state law supplies a rule of the

18 decision.  Virginia law is going to be supplying the rule of

19 decision, for the reasons we just went through for the

20 choice of law motion, understanding that there may be some

21 ones that we still need to brief, such as the loss of

22 consortium, and Virginia law should apply under the language

23 of the rule.

24    That's how I read the rule.  There is a case from the

25 District of Massachusetts that agrees with my reading of the

37

1   rule.  I will acknowledge there are some Ninth Circuit cases

2   that came out differently.

3           THE COURT:  Yes.

4           MR. GOLDEN:  I think we could distinguish them on

5   the facts, but that would be a challenge for your Honor.  I

6   recognize that.

7           THE COURT:  Yes, and I appreciate that candor with

8   the Court, because that's exactly what I'm looking at, which

9   is that the reading of this is state law governs the witness

10  competency regarding a claim or defense for which state law

11  supplies the rule of decision, not "the state law," but

12  state law, and we're in California, and it's a procedural

13  question, and California would follow California law.

14          MR. GOLDEN:  Just to amplify my point, and this is

15  more for the record than anything else, but the purpose of

16  Rule 601 was to protect items such as deadman's statutes,

17  and in doing that, it's really already found that these are

18  substantive issues, rather than procedural, because, if this

19  was considered only procedural, you wouldn't need Rule 601.

20  You would just always apply the law of the forum.

21      So I think the Ninth Circuit may not have appreciated

22  that in the cases where it said that it is.  You do need to

23  go through the choice of law of the forum, and then decide

24  if the forum thinks it's procedural or substantive.  So I

25  think the language of the rule and the purposes of it both

38

1  say it's not a procedural issue, but let's go to step two,

2  (indiscernible) three parts, and that is it's a substantive

3  rule or a procedural rule, and what does California think

4  about that?  Because it's a federal court.  You have to look

5  at what California would do, right?

6          THE COURT:  Right.

7          MR. GOLDEN:  So I agree that, in the abstract,

8  competency often is a procedural issue, but it is not always

9  a procedural issue, and there's no bright-line rule.  There

10 are a number of California cases that have looked at

11 evidentiary rules and concluded that they're substantive.

12 One of them would be Chavez v. Keat, which -- I can give you

13 the citation, if you need it.

14         THE COURT:  Yes, please.

15         MR. GOLDEN:  It's 34 Cal.App.4th 1406, from 1995,

16 and this discussion begins at page 1413, and the header on

17 that says:

18         "California's rule that a punitive

19         damage award must be supported by

20         evidence of the defendant's financial

21         condition is substantive law."

22     So, even though that was an evidentiary rule --

23         THE COURT:  Say that again.

24         MR. GOLDEN:  Sure:

25         "California's rule that a punitive

39

1          damage award must be supported by

2          evidence of the defendant's financial

3          condition is substantive law."

4     So all I'm citing that for is, just because it's an

5 evidentiary issue doesn't mean it's automatically

6 procedural, rather than substantive.  If you look at --

7          THE COURT:  I'm sorry.  Can you give me the <u>Chavez</u>

8 cite one more time?

9          MR. GOLDEN:  Sure.

10          THE COURT:  (Indiscernible) got it down right.

11          MR. GOLDEN:  It's 34 Cal.App.4th --

12          THE COURT:  Fourth.  Thank you.

13          MR. GOLDEN:  -- 1406, and the discussion that I'm

14 referring to starts on page 143 (sic).

15          THE COURT:  Okay.

16          MR. GOLDEN:  So let's look at the specific issue

17 now in our case, which is the Virginia rule versus

18 California rule, and the cases that we cited in our brief,

19 <u>Liebzac</u> (phonetic), cites to -- it relies on a Sixth Circuit

20 case called <u>Legg v. Chopra</u> (phonetic), and that case

21 explains that competency rules can be substantive, and so it

22 says, quote:

23          "However, some state evidentiary rules

24          have substantive aspects thereby defying

25          the substance/procedure distinction and

40

```
 1              creating potential (indiscernible)
 2              conflict.  State witness competency
 3              rules are often intimately intertwined
 4              with a state substantive rule.  This is
 5              especially true with medical malpractice
 6              statutes, because expert testimony is
 7              usually required to establish the
 8              standard of care.  The Federal Rules of
 9              Evidence resolve this potential conflict
10              between state and federal law on the
11              issue of witness competency.  Rule 601
12              incorporates the (indiscernible) mandate
13              by expressly providing that state law
14              supplies the rule of decision.  Then the
15              competency of a witness shall be
16              determined in accordance with state
17              law."
```

18    So here we have a Virginia rule about whether a
19 neuropsychologist who has a PhD, but does not have an MD,
20 can talk about causation, and that's intertwined with
21 substantive law.  What can you show to prevail on causation,
22 which is a mandatory element of all of Mr. McLaughlin's
23 causes of action?  And so it is very much bound up with
24 substantive law.  It's a rule that it is for substantive
25 reasons.

41

1    It's not a rule about how old you would have to be to
2   testify, or whether -- how much alcohol you can drink before
3   you're not competent to testify anymore.  Those would be
4   procedural witness competency rules.  The Virginia rule,
5   though, is very much a substantive rule, because it bears
6   upon the substance of the causes of action and what a
7   plaintiff would need to prevail on those causes of action.
8    So it's a substantive rule, which means we do need to
9   apply the governmental interest test, the three-part test
10  that your Honor called out in the tentative, and under that
11  rule, Virginia has an interest, because Plaintiff was
12  injured in Virginia, was treated in Virginia, and -- I think
13  it's Doctor Fratto -- is practicing in Virginia.  His office
14  is in Virginia, and Virginia has an interest in regulating
15  the standards that govern medical professionals that operate
16  in Virginia, and that would be on top of all the McCann
17  reasons that we talked about previously.
18   So, for all of those reasons, we would request that
19  your Honor rule that the Virginia law applies, and my final
20  request would be that if you think you need briefing on
21  this, because we didn't talk about it in the briefs, we'd be
22  happy to submit a supplemental brief on this issue.
23       THE COURT:  All right.  Give me just a moment.
24  Let me just get my note, here.  Okay.  All right.  Thank
25  you, Mr. Golden.

42

1          Mr. McDevitt.

2          MR. MCDEVITT:  So we agree with the Court

3   reasoning as (indiscernible) prior to Mr. Golden speaking,

4   that this is a procedural issue, and, therefore, it would be

5   the California substantive law that would apply, and I

6   think, unless the Court wants me to further elaborate on

7   that, I'll just get to the next point about the choice of

8   law.

9          THE COURT:  Yes, please.

10          MR. MCDEVITT:  Okay.  So, to the extent the Court

11   does get to the government interest analysis, I actually

12   don't think the Court will get past the first step, because,

13   although Tesla frames this as a strict exclusionary rule,

14   examining the cases reveals that it is not a bright-line

15   rule like Tesla suggests to the Court.

16          Starting off with "Is there a difference between

17   Virginia and California on admissibility of expert

18   opinions?," the starting point is, Virginia says that an

19   expert can testify that they have sufficient skills,

20   knowledge, and experience.  That's from Fitzgerald v.

21   Commonwealth, 273 Va. 596.

22          California says an expert can testify in California if

23   the testimony is based on a matter including special

24   knowledge, skill, experience, training, and education, which

25   is Evidence Code 801, involved the -- I think what Tesla is

43

1  (indiscernible) exclusionary rule.  The Virginia Supreme

2  Court has framed that as a general rule.  It's not an

3  absolute rule.  In fact, I'll read from (indiscernible)

4  report.  It says, quote:

5           "The Virginia Supreme Court, however,

6           has never stated that it's an absolute

7           rule that only a medical doctor can

8           testify as to medical causation or

9           diagnosis.  Indeed, while the Court has

10          noted, 'The general rule is that "Only a

11          medical doctor may give an expert

12          opinion about the cause of a physical

13          human injury,'" there are an uncertain

14          number of exceptions to this rule."

15     And that's from the Creekmore decision we've cited in

16  our papers, but (indiscernible), Creekmore v. Maryview

17  Hospital, and that's 2008 WL 5100110, and in Creekmore, the

18  Court further states:

19          "A decision as to whether an expert

20          witness is qualified to testify as to

21          causation must be made on a case-by-case

22          basis."

23     So I think the Court really doesn't get past the step

24  one.  There really isn't a conflict in the law, and there

25  are some -- there's a number of cases that demonstrate this.

44

1    For instance, in <u>Velasquez v. Commonwealth</u>, the Virginia

2    Supreme Court affirmed a trial court's decision to allow a

3    sexual assault nurse examiner to testify as to causation,

4    obviously not an MD, and the Court noted that, quote:

5              "It has long been accepted that nurses

6              and other health care professionals with

7              the proper training, expertise, and

8              experience are qualified to give expert

9              opinions on medical causation in

10             appropriate circumstances."

11      And additional decisions would include the <u>Fitzgerald</u>

12   <u>v. Commonwealth</u>, where -- and that's 274 Va. 596.  It's a

13   2007 case where the Virginia Supreme Court affirmed the

14   trial court's decision to allow a licensed professional

15   counselor to render an expert opinion as to the diagnosis of

16   an individual suffering from post-traumatic stress syndrome,

17   even though, generally, such a diagnosis is made by a

18   psychologist.  And the defense made the same argument that

19   Tesla makes here, and that was rejected by the Court.  In

20   particular, the Court said, quote:

21             "We stress that the trial court must

22             determine whether a licensed

23             professional counselor called an expert

24             witness in a given case in fact

25             possesses sufficient skills and

45

1          knowledge and experience as to the

2          subject matter of the anticipated

3          testimony."

4     The point being there, your Honor, that it's not a

5 bright-line rule.  It is the traditional type of analysis of

6 looking at the expert's skill, knowledge --

7          THE COURT:  And those cases are cited in your

8 brief, aren't they, Mr. McDevitt?

9          MR. MCDEVITT:  Yes.

10          THE COURT:  Yes.  I read those, yes.

11          MR. MCDEVITT:  But the one -- in the reply papers,

12 Tesla indicated that the -- in Creekmore, the defense never

13 raised the exclusionary rule, and, therefore, the Court does

14 not consider it.  That may be true as to Creekmore, but it

15 is not true as to the case of Christianson v. Scotness

16 (phonetic), where the Court addressed that argument head-on,

17 and in that decision, the Court said, quote, "In any event,

18 in this court, Federal Rules of Evidence, and not Virginia

19 law, govern the admissibility of evidence," and rejected the

20 notion that the, quote/unquote, "exclusionary rule" had to

21 be applied.

22     So I don't think the Court should get past the first

23 step, and to the extent it does, I guess, on the second

24 step, I'm not -- I don't know that I can say that either

25 state has a stronger interest in (indiscernible) under the

46

1  second step of the analysis.

2      But, under the third step, on which law would be more

3  impaired if this law was not applied, that would be --

4  California would be more impaired, because, in part, the

5  application of Virginia law would then allow qualified

6  experts who would otherwise be qualified in California to be

7  excluded in diversity actions, essentially, and the

8  application of California law, on the other hands, would

9  further both states' interest, applying a case-by-case

10 analysis to determine if a specific expert is qualified to

11 testify on the subject matter.

12          THE COURT:  All right.  Thank you, Mr. McDevitt.

13      I'd like to move on to the other Fratto issues, so

14 let's do that.  I'm mindful of the time, and I've got a

15 grand jury coming in at 12:00.

16          Ms. Gampart (phonetic), can you get me the trial

17 calendar, the court trial calendar for Monday?

18          THE CLERK:  Yes.  (Indiscernible.)

19          THE COURT:  Yes.

20          THE CLERK:  Yes.  Okay.

21          THE COURT:  Thank you.

22      Okay.  Let's turn to the second of four arguments

23 challenging Doctor Fratto, which is, Tesla argues that he is

24 unable to opine whether it is more likely than not the

25 Plaintiff's injuries were caused by the accident, as opposed

47

1  to preexisting injuries, and, therefore, his testify is

2  unreliable under the rubric of Federal Rule of Evidence 702.

3  So you saw in my tentative that I was inclined to deny this

4  motion, and I'm just looking at my ruling, here.  Okay.

5       So, Mr. Golden, did you want to be heard?

6            MR. GOLDEN:  I would like to be heard, but now I'm

7  kind of sympathetic to Mr. McDevitt's point about the

8  tentative.  We really appreciate getting the tentative, but

9  it would be helpful --

10            THE COURT:  It can give you a lot of information.

11            MR. GOLDEN:  Yes, your Honor.  So, if your Honor

12  could explain why the tentative was to deny, that might

13  help, but I'm prepared to proceed either way.

14            THE COURT:  Yes.  Let me enlighten you, which is,

15  in looking at Rule 702, and just let me find my document

16  here, with my notes, and my notes over here.  Here we go.

17  And this one is over here.  Excuse me while I'm just

18  shifting, get my correct documents in front of me.

19       As I understood, Tesla's argument was that Doctor

20  Fratto could not apportion, could not give a percentage, as

21  to what was caused by the motor vehicle accidents --

22  accident, excuse me -- as opposed to by other causes or

23  other preexisting causes, and I looked carefully at that

24  argument, and I looked at the evidence that was supported,

25  specifically the Fratto -- the depo excerpts, and I

48

1  determined that, I mean, in the end, Tesla pieced together
2  all of the -- what it perceives as the weak spots in Doctor
3  Fratto's testimony -- that was your motion, I think, laid
4  out very clearly at page nine -- and argues, then, from that
5  that all of these flaws add up to an inability to opine that
6  the motor vehicle accident, more likely than not, caused the
7  cognitive defects.
8      But when I actually look at the Fratto testimony,
9  Doctor Fratto does rebut that conclusion, and in taking his
10 deposition, counsel tried Doctor Fratto out on -- asked him
11 very clearly, "So there's no medical probability that the
12 motor vehicle accident caused his cognitive impairment?"
13 And the doctor rebutted that with his basis, which is
14 looking at the Plaintiff's life history on which Doctor
15 Fratto's testimony rests, and that's at page 217 and 218 of
16 his deposition.
17     So my point is that he rebuts all of the weak spots.
18 He has something to say, and it may or may not be a strong
19 rebuttal, but that's really for the jury to decide.  So I
20 think he does get through the preponderance of evidence
21 requirement of Rule 702, or "more likely than not" standard
22 of Rule 702.  It may be a close call on the record before me
23 at the moment, but he gets over that hurdle.
24         MR. GOLDEN:  Thank you, your Honor.  That does
25 help.  I would say at least this issue and the next issue

49

1   kind of bleed into each other a little bit.

2          THE COURT:  They do, and if you want to address

3   them --

4          MR. GOLDEN:  The issue of whether his methodology

5   is sound, and he has adequately rebutted the other issues

6   sufficient to allow the jury to decide, goes to the third

7   issue.  The second issue goes to whether the testimony would

8   be helpful to the jury, and I think we all agree, and it's

9   true under California law and Virginia law, that you have

10  to -- it has to be more probable than not that the tort

11  caused the injuries.

12      And the issue is that, in addition to all of the other

13  parts of Doctor Fratto's deposition testimony, he said he

14  can't put the percentage on the cause of the cognitive

15  defects being pre versus post.  So, if he can't say that

16  there's a one-percent chance -- he doesn't know if there's a

17  one-percent change, a 20-percent chance, 50-percent chance,

18  70-percent chance that the cognitive defects were caused by

19  the accident, then his testimony is not helpful to the jury,

20  and that's what the Ninth Circuit held in the <u>Seminole</u>

21  <u>Dopper True</u> (phonetic) case that we cite in our briefs.

22      And so I would just point your Honor to the deposition

23  testimony, where Ms. Darrell asked him not about how much of

24  the injury is attributable to pre versus post, not only

25  that, but also the cause.

50

1          THE COURT:  Right, which was at page 279.  Right?

2          MR. GOLDEN:  Yes.

3          THE COURT:  That's the language.  Yes.  I noted

4   that, yes.

5          MR. GOLDEN:  Okay.  So it was --

6          THE COURT:  I have that in my --

7          MR. GOLDEN:  -- yes, the cause of some of his

8   cognitive defects, and he said, "I cannot put a percentage

9   on that."  So, if he's not prepared to come in and say that

10  there's at least a 51-percent chance that the cognitive

11  defects were caused by the accident, then his testimony is

12  not helpful to the trier of fact.  So it should be excluded

13  for that reason.

14         THE COURT:  All right.  Thank you.

15     Mr. McDevitt.

16         MR. MCDEVITT:  I think the Court has it right.  He

17  is not required to give a percentage.  I think that that

18  would be -- it would be unrealistic to say that he could

19  give a percentage.  He's required to say it's more probable

20  than not that it was a cause of the symptoms that he's

21  experiencing, and that's what he did.

22      The points that the defense makes goes to the weight,

23  and they certainly have their experts who reach an exact

24  opposite opinion, and they have the reasons that they say

25  for doing that, but the methodology that was used, that he

51

1  used, is the methodology that is used by neuropsychologists,

2  including the defense neuropsychologist, and the basis for

3  his opinion, or the degree to which he holds an opinion --

4  he indicates in his report the opinions are above or held to

5  a high degree of neuropsychological certainty, which is more

6  than he has to do, and all of the points the defense makes

7  are ones that they can cover in cross (indiscernible).

8         THE COURT:  All right.  Thank you.  I think I

9  understand the arguments on both sides, and I will continue

10  to give that very careful consideration.

11      So let's go to the third issue, the third challenge,

12  which, as Mr. Golden acknowledged, kind of leads into this

13  one, which is whether or not he considered, that is, Doctor

14  Fratto considered, all of the available data,

15  specifically -- or was based on -- not all available --

16  what's the wording in 702? -- sufficient, sufficient facts

17  and data.

18      And the focus here seems to be on the jiu-jitsu issue,

19  where Defendant -- excuse me -- where the Plaintiff had

20  reported at one point that he had suffered head injuries

21  from that, and that was not considered by Doctor Fratto, and

22  he was very clear in his deposition that he didn't have any

23  information on the jiu-jitsu arguments, and he can't rule

24  out that he may have been injured from that, and he would

25  need more information.

1    Again, my ruling, I stepped back.  I looked carefully
2  overall at the evidence that was submitted in support and
3  opposition of this motion, and I think that the cases do
4  allow for -- you don't have to consider every preexisting
5  event -- or previous event, or preexisting condition, or
6  possible causes.  You certainly have to consider the obvious
7  ones, and we don't have any medical testimony in the record
8  that there were injuries from jiu-jitsu.  Again, maybe it's
9  a close call, but I think that we've moved past 702 to an
10  issue that's for the jury to decide.
11    Mr. Golden.
12        MR. GOLDEN:  I agree with your Honor that the
13  expert doesn't have to rule out every conceivable cause, but
14  I think the expert does have to at least try to rule out
15  other likely causes, and in our case, you have the patient
16  self-reporting head injuries that he says are getting worse
17  about a year before the accident.
18    So this was close in time to the accident.  It's coming
19  from the patient, and that's in the report, Doctor Fratto's
20  report that we cited and attached to our motion, so that
21  there is a medical record where that is the Plaintiff's
22  self-report, and I think that it is unreasonable for an
23  expert to not even try to rule out a likely explanation that
24  the patient himself is saying is the cause of the injuries.
25  I think that that does need to be considered, accounted for,

53

1  and Doctor Fratto, as your Honor pointed out, was forthright
2  about the fact that he didn't do that, and that's on top of
3  all the -- everything else.

4      If we didn't have the jiu-jitsu, this might be a close
5  call, given all the other problems and the extensive history
6  of injuries, but when you add that on top of all the other
7  problems with the testimony, then it crosses the line, and
8  the advisory committee notes to the amendments to the rule
9  that are recent say it's not about weight versus
10 admissibility.

11         THE COURT:  Fair.

12         MR. GOLDEN:  So, for those reasons, his failure to
13 even try to account for the jiu-jitsu head injuries reported
14 by Mr. McLaughlin means that his opinions are unreliable
15 under the rules, and they should be excluded.

16         THE COURT:  All right.  Thank you.

17     Mr. McDevitt.

18         MR. MCDEVITT:  So, your Honor, there is no
19 (indiscernible).  The defense argument here is the exact
20 opposite of what every one of their retained medical experts
21 has testified (indiscernible).  Each expert retained by the
22 defense has opined that he had no concussions, never, not a
23 single one, and so their medical experts are saying he had
24 no concussions.  There's no history of concussions,
25 including from jiu-jitsu.

54

1    Then they want to say, "But Plaintiff's expert" --
2  that's a likely cause of his issues and his complaints, and
3  that Plaintiff's expert has to rule that out, when the
4  medical experts that they had retained had said the
5  opposite, and opposed to counsel making a -- or legal
6  counsel making, you know, a speculation that that's
7  something that needs to be taken into account.
8          THE COURT:  So, in your opposition, you refer to
9  Doctor Rafael (phonetic), who's one of Defendant's medical
10 experts, correct?
11         MR. MCDEVITT:  Yes, your Honor.
12         THE COURT:  Okay.  And I did look at that
13 testimony.  That seemed to be inconclusive.  I mean, it just
14 seemed she wasn't prepared to give an opinion on whether
15 jiu-jitsu had caused a concussion.  Am I remembering that
16 correctly?
17         MR. MCDEVITT:  Yes, your Honor, and I will say
18 that we didn't include all the defense experts' opinions and
19 testimony, but the other experts that were retained by
20 defense opined that he didn't -- there was no evidence that
21 he had any concussions, ever, including during his military
22 service, that he had no preexisting concussion issue.
23    So there's nobody with a medical background on the
24 defense side that says the jiu-jitsu probably caused a
25 concussion or a head injury that would provide an

55

explanation for his symptoms, and, therefore, to say that
Doctor Fratto has -- I guess my point, your Honor, is that
this is not a competent foundation for the argument that
they're making.  It's just for an attorney to throw it out
there, that that could explain it, and in the cases that
your Honor acknowledges and that we cited to you, Doctor
Fratto did take into consideration Mr. McLaughlin's history,
but there isn't evidence indicating that he had a, you know,
concussion that needed to be considered as a cause of -- an
alternative cause of the symptoms.  So, again, I think this
is something that they, you know, can bring up in cross, but
it is not a basis for which his testimony should be
excluded.

        THE COURT:  All right.  Thank you.

        MR. GOLDEN:  May I briefly respond to that, your
Honor?

        THE COURT:  Very briefly.

        MR. GOLDEN:  First, it doesn't matter what Tesla's
experts do or don't opine, because, under Daubert, you're
not looking at the opinion.  You're looking at what it's
based upon, and whether it's reliable or not, and the
problem is it's not reliable.

    In terms of what our experts are saying, it's far more
complicated than what Mr. McDevitt has set forth.  We're
saying that currently there's no post-concussive syndrome,

56

1  but it's complex, and it doesn't matter for this motion.  So

2  I'm not going to get into it any further on that.

3           THE COURT:  Okay.  All right.  Thank you.

4  Appreciate it.

5      All right.  Let's move to Doctor Andre, where we have,

6  again, three, I think -- excuse me.  Let me just get my

7  right notes here in front of me.  You know, three

8  challenges, one on the -- with regards to the gear stock,

9  and what Plaintiff believed he did on the day of the

10 accident, the review and reliance on Internet posts, and

11 then the testimony regarding the voluntarily recall.

12     So let's start with the gear stock issue, which is a

13 motion to exclude the opinion that Mr. McLaughlin pulled the

14 stock twice, and, more particularly, to exclude the ultimate

15 conclusion that Mr. McLaughlin's belief that he pulled the

16 stock twice, or engaged the autopilot, was reasonable.

17          MR. MCDEVITT:  Your Honor, before we address

18 those, my understanding as to the third, the voluntary

19 recall, in the tentative -- as I understood it, you had

20 presented the option to defense counsel as to whether they

21 wanted it addressed today or a subsequent motion in limine.

22 My understanding from speaking with defense counsel is that

23 they're electing to reserve that for a motion in limine.  So

24 I don't think that (indiscernible) to discuss.

25          Is that correct?

57

1      MR. GOLDEN:  Yes.  I think I may have mentioned

2 that earlier.

3      THE COURT:  You did mention it, and I'll hold you

4 to it.  If you're prepared to take that position today, then

5 you will withdraw that as part of the Daubert ground, and

6 we'll take it up as one of your five.

7      MR. GOLDEN:  It was unclear to us whether that

8 would be considered Daubert or not, so that's why we

9 included it.  We're happy to address it in a motion in

10 limine.  So we'll withdraw that portion of the motion for

11 today.

12      THE COURT:  All right.  Good.  Then I'll more

13 likely be on time for the record of the day.

14    Okay.  Then let's start with the "exclude the opinion

15 that Mr. McLaughlin pulled the stock twice."  You saw in my

16 tentative, which I am inclined to grant this motion.  Let me

17 give you some --

18      MR. MCDEVITT:  Your Honor, I believe, in our

19 opposition, we concede we're not going to have

20 (indiscernible) opinion.  That was something that, during

21 the deposition, defense counsel went into, as to him opining

22 that versus there being testimony about it.  We are fine

23 with the -- or agreeable to the Court's decision, and he's

24 not going to offer that opinion.  However, you can -- you

25 know, that wouldn't preclude him from reciting or pointing

58

1  to what he believed was the evidence that he did, so as

2  opposed to him saying, "It's my opinion you did," or

3  "There's evidence in the record, or testimony."

4         THE COURT:  What concerns me, Mr. McDevitt, is I

5  read the opposition was you were preserving the ground for

6  him to -- for Doctor Andre to testify that Plaintiff's

7  belief that he pulled the gear stock twice was reasonable.

8         MR. MCDEVITT:  Okay.  And perhaps I may have

9  (indiscernible) misunderstood the tentative.

10        THE COURT:  Okay.  Because I don't think -- and

11 that's what my tentative was really directed to, is there's

12 not a sufficient factual basis to render that opinion that

13 the Plaintiff's belief is reasonable.

14    Let me clarify.  All right?  Andre, as any -- he can

15 restate any fact that Plaintiff testifies to or is otherwise

16 in the record as a basis for his opinion, right?  Andre can

17 say, "Here's my opinion, and it's based on these facts,"

18 right, facts that are in the record.

19    But here Plaintiff -- we have this -- Plaintiff

20 testifies repeatedly in his deposition that he doesn't

21 remember what he did in terms of activating autopilot on the

22 day of the accident.  He does testify that most days he used

23 autopilot, and that he engaged it by pressing the stock

24 twice, but that's not the same thing as he thought he did it

25 that day, or he reasonably believed he did it that day,

59

1  which is what I understood the proffer was.

2          MR. MCDEVITT:  And to the extent that that's what

3  the Court is focused on, I would agree.  I think that's not

4  necessarily the same as him saying it was foreseeable or

5  this is understandable from a human factors standpoint of

6  how that could happen, but, to the extent that's what the

7  Court is talking about, that it's reasonable for him to

8  believe he did, I think that kind of gets into a memory

9  issue, anyway.  So I don't --

10          THE COURT:  Okay.

11          MR. MCDEVITT:  So I'm fine with that.

12          THE COURT:  Okay.  And have I stated your grounds

13  for -- or your motion -- the scope of what you were trying

14  to exclude correctly?

15          MR. GOLDEN:  Yes.  He shouldn't be able to tell

16  the jury that he did pull it twice, or he reasonably

17  believed he pulled it twice.  He can say there is such a

18  thing as mode confusion, and drivers experience it, and

19  maybe that it's foreseeable that drivers can have mode

20  confusion, and that's different from saying that, because of

21  that, he reasonably believed that he had engaged it on the

22  day of the incident.

23          THE COURT:  Okay.  Then I will -- okay.  Then I

24  think the opposition as -- for what testimony it is trying

25  to exclude, I don't think there's an opposition, any

60

1 opposition to that.

2          MR. MCDEVITT:  Correct.  And I think, generally,

3 to the extent you get into experts providing opinions on the

4 standard of care or reasonableness of lay persons, I think

5 generally my understanding is you can't do that, because

6 it's not a professional standard of case.  So I would expert

7 for both sides --

8          THE COURT:  Yes.  Not really a topic for expert

9 testimony.  But let's not -- I will try to refrain from

10 engaging in a hypothetical ruling, and try to keep us on the

11 facts, here.

12      So the second Andre challenge was to exclude opinions

13 based on his web review, his review of -- reviews of Tesla,

14 allegedly by Tesla users on the Internet, and that was a

15 challenge under Rule 703 as improper expert testimony, and

16 to also exclude the actual reviews as highly prejudicial,

17 also in the rules, 703.

18      I think of it as 703 having part A and part B.  I know

19 it's not written that way, but part A is, is this something

20 that an expert would reasonably rely upon in forming their

21 opinion, even if that material would not, by itself, be

22 admissible?  I think of that as 703(a), and I think that's

23 one question, and then the second is that the facts or data

24 that would otherwise be inadmissible may, in fact, be

25 disclosed to the jury only if the probative value, in

61

1 evaluating the opinion, substantially outweighs the

2 prejudicial effect, and I think of that as 703(b).

3     So my ruling -- as I indicated, I was granting -- grant

4 in part and deny in part, in that I think that Doctor Andre

5 does sufficiently validate the use of Internet posts of

6 others' experiences as something that a human factors expert

7 relies upon, and he does that in his deposition, at page

8 162.  He talks about "In my field, this is standard fare,

9 what we go to and look at."

10     So I think, because of that, he can offer an opinion

11 based on these reviews.  However, I think that -- well, let

12 me just say, as far as other challenges to whether he should

13 or could or reasonably is relying on that, such as they are

14 anonymous and they're not verified, at that point, that goes

15 to the weight, and can be argued before the jury.

16     Getting us to the 703(b) part about weighing the

17 probative value of these on-line posts, which are anonymous

18 and unverified, I am inclined to disclose -- excuse me,

19 exclude -- disclosure of the actual on-line posts and

20 reports pursuant to 703 and 403.  Andre can explain his

21 methodology generally.  He can summarize what he found

22 without disclosing the actual posts, but, given their

23 nature, their on-line nature, anonymous, unverified, no

24 weight and no -- again, if the substantial factors of these

25 incidences are the same, the actual posts would exclude it.

62

1      So, grant in part, deny in part.

2      Tesla, it's your motion, so let me start with you.

3           MR. GOLDEN:  Thank you, your Honor.  On part A,

4  the methodology for human factors to go, for lack of a

5  better phrase, look at stuff on the Internet, that they do

6  that, don't dispute that.  The question is, what is he

7  relying on the Internet posts for, what opinion?  Is it

8  merely to say that there is such a thing as mode confusion,

9  and you can see people posting stuff on the Internet where

10 they've experienced mode confusion?  Then there's really no

11 dispute that there is such a thing as mode confusion, that

12 that exists, so that opinion really isn't helpful to the

13 trier of fact in this case.

14          THE COURT:  Are you going to stipulate to that?

15          MR. GOLDEN:  Not now, but we can talk about it,

16 and I would need to confer with my team.  But we do agree

17 that there is something else called "mode confusion" that's

18 out there.

19      If Doctor Andre is relying on this review to say that

20 Mr. McLaughlin experienced mode confusion, then it's a

21 different story, and an expert couldn't reasonably rely on

22 those Internet posts for that opinion, for all the reasons

23 we talk about in the brief.  They're not comparable

24 incidents.  There's no way to know what actually happened,

25 in any event, and we can't even try to track these people

63

1 down to find out, because they're anonymous.

2      So the opinion that there is such a thing as mode

3 confusion, I guess Doctor Andre can say that, but he doesn't

4 need the Internet posts for that.  If he wants to make the

5 further opinion that that's what happened in this case, then

6 he couldn't reasonably rely on the posts.  So that's our

7 position on part A.

8      On part B, there's an additional prejudice, which is,

9 if he's going to generally disclose that he went to the

10 Internet, but not talk about the substance of the posts,

11 which is what we asked, then, on cross, defense counsel is

12 going to be put in the position of having to bring them out

13 anyway, to challenge the opinions of the expert, and that

14 would be prejudicial to the -- so they end up coming in that

15 way, if defense counsel chooses to do that

16           THE COURT:  Wouldn't you -- no.  Wouldn't you be

17 able to challenge them for all the reasons you argued in

18 your brief, as they're anonymous, and they're unverified,

19 and there's no -- you don't know what any of the

20 circumstances were, et cetera?  I mean --

21           MR. GOLDEN:  Well, let me back up and -- I was

22 also going to ask for a little bit of clarification on the

23 ruling.  So let me do that now, because my answer to your

24 question will depend upon that.

25           THE COURT:  Okay.

64

1          MR. GOLDEN:  Doctor Andre, is he going to be
2   permitted to say, "I went onto the Internet and looked at
3   Internet posts, and I did that in formulating my opinions"?
4   Or is he going to also be able to say, "I went on the
5   Internet and saw lots of people complaining about Tesla
6   vehicles," but not be able to specifically say what any of
7   the complaints were?  I'm not sure if you're following my
8   question.

9          THE COURT:  Your question is, can he say, "I went
10  on the Internet.  I viewed this, you know, again, alleged
11  users' issues.  Load confusion is a real thing, and it
12  happens," right?  That's your question?

13         MR. GOLDEN:  Well, that, I think, is fine, like,
14  within the -- assuming you disagree with me on part A of the
15  analysis.  That would be fine, but it would not be fine for
16  him to make the further statement, "Lots of people
17  complained about Teslas."

18         THE COURT:  You mean generally?

19         MR. GOLDEN:  Yes, that "I found all these people
20  complaining about Teslas, and having mode confusion when
21  they were using Teslas."  That would be getting into the
22  substance of the --

23         THE COURT:  I'm sorry.  Are you distinguishing
24  between identifying Tesla, or between -- as between your
25  first and second examples?

65

1          MR. GOLDEN:  Here's what I understand, how the

2    rule works, is if there's inadmissible evidence, an expert

3    can rely on it, but he can't disclose its contents to the

4    jury.  So he can generally say, "I did an Internet review,

5    and I relied on that Internet review as grounds for my

6    opinions."  That would be fine.

7          THE COURT:  Right.

8          MR. GOLDEN:  I don't think it would be fine for

9    him to indirectly disclose the contents of the posts by

10   characterizing them or saying, "And what I found when I did

11   my Internet review was people complaining about Teslas and

12   experiencing mode confusion using Teslas," because that

13   would be getting into the substance of the inadmissible

14   evidence.

15          THE COURT:  I disagree.

16          MR. GOLDEN:  Okay.  That was my question.

17          THE COURT:  I disagree.  Yes.  Yes.  So you would

18   say -- Andre can testify -- I mean, I think you already

19   said -- I mean, mode confusion exists.

20          MR. GOLDEN:  Yes.

21          THE COURT:  Hence my question about stipulating,

22   which you are not required to answer today, but, I mean,

23   mode confusion is only relevant if it relates to Teslas.  I

24   mean --

25          MR. GOLDEN:  Yes.  It's only relevant -- well, it

66

1 depends upon what the Plaintiffs' theory is, and now their

2 theory is there was mode confusion, and that's what caused

3 the accident, because he thought he had autopilot on, but he

4 didn't have autopilot on.

5          THE COURT:  Right.

6          MR. GOLDEN:  So I think, generally, stuff about

7 mode confusion is -- it's relevant, but not super relevant,

8 if that makes sense.

9          THE COURT:  All right.  But that's not an issue

10 for today.

11          MR. GOLDEN:  No, it's not.

12          THE COURT:  But it has to be -- and it is --

13 again, I'm trying to figure out -- are you trying to say

14 that he shouldn't be able to opine that it's mode confusion

15 about Teslas?

16          MR. GOLDEN:  No.  I'm only talking about the

17 Internet posts.

18          THE COURT:  I know.

19          MR. GOLDEN:  So, if he starts saying, "I found

20 posts by people complaining that they had mode confusion

21 while using a Tesla," that's the same thing as disclosing

22 the -- that is disclosing the inadmissible evidence to the

23 jury, which is the posts.  So you may not be showing the

24 actual post, but it amounts to the same thing.

25          THE COURT:  All right.  I understand your

67

1  argument, Mr. Golden.

2          MR. GOLDEN:  Okay.

3          THE COURT:  All right.  Mr. McDevitt.

4      Give me just a second.  I'm looking at my -- at EC

5  excerpts that were provided to me of the Andre testimony in

6  the record for these motions.  You know, it's the relevant

7  facts he has his opinions about, Tesla design and causing --

8  Tesla design, and that design causing mode confusion, "Tesla

9  design producers, mode errors, and mode confusion."  I'm

10 just quickly casting my eyes over his report, and then he

11 lists many, many posts that relate to engagement and

12 disengagement confusion.

13         Mr. McDevitt.

14         MR. MCDEVITT:  So I guess, just coming back and

15 kind of going through -- walking through this step mode,

16 there doesn't seem to be a dispute that this was either

17 things that -- human factors experts rely upon.  I think

18 also worth noting, that Tesla engineers themselves look to

19 all of these same web sites and do what's called a "social

20 listening report," where they are relying on reviewing the

21 lines circulating these --

22         THE COURT:  I've already said I agree.  He can --

23         MR. MCDEVITT:  Okay.  So, in terms of the contents

24 or substance of them, if for no other reason than notice,

25 the jury should be able to -- then he could say they're not

68

1 for the truth, but for notice, and the effect on Tesla, or

2 what should have been the effect on Tesla, and our criticism

3 of them not taking earlier action, and different action,

4 prior to the incident.

5     I think, for those reasons, they would be independently

6 admissible, but, in terms of him relying on them and

7 conveying to the jurors what he's relying upon, I think I

8 agree with the Court.  It wouldn't make sense for him to

9 say, "I went on the Internet and saw something about mode

10 confusion," unless it did relate to Tesla, and unless it was

11 consistent with the type of mode confusion that he said

12 should have been expected, would have been expected, and was

13 evidenced through these posts.

14     So I guess I'm not entirely clear, either, your Honor,

15 exactly how (indiscernible).

16         THE COURT:  Well, neither side laid out very

17 specifically -- I'm going to generally exclude the -- either

18 let the posts -- let him rely on posts, and/or let the posts

19 in, either -- I mean, let him rely or don't rely on posts,

20 and either let the posts in or don't.  I didn't get any more

21 information about what it is you're trying to -- like, what

22 the testimony would be from the posts.

23     And I do take Tesla's point.  If stand on my tentative,

24 and I'm going to allow him to refer to Internet posts, but

25 not have the posts be admitted, then how much can he say

69

about the posts?  So, you know, I think I need more

information.

MR. MCDEVITT:  Yes.  And I think it would need to

be the type that -- I mean, his overall criticism stems from

the beginning, about how they designed the vehicle, the

failure to account for or include any human factors, with

human factors analysis, in the production of a design that

was prone to causing mode confusion.  Obviously, their

expert -- or not "obviously."  Their expert disagrees.

Part of that process is ongoing monitoring and

updating, changing, from a human factors standpoint.  In

other words, you don't stop once the product is released.

You know, you should do all these things beforehand, but

then you should also be looking to sources that are

reasonably relied upon, and, as Tesla's conduct indicates,

these are all web sites they look to, to see how users are

experiencing the product and what issues they're having with

the product.  These would all be evidence of that.

So I guess, from my perspective, it would be him

saying, "Part of what I did was what their engineers

(indiscernible), is looking on line to see what sort of

feedback people were offering on these particular features,

and whether people were experiencing mode confusion or

experiencing confusion while using it, and I came across

those that were exactly that, consistent with that."

70

1    And that would -- again, even if it's not for the

2  substance, this could be for notice, not necessarily for the

3  truth of the fact that people are commenting, that, from a

4  human factors standpoint, just noticing or knowing of the

5  comments, the complaints, from our position, should have

6  prompted some further action, which is, you know, consistent

7  with the case law that relates to how -- the difference

8  between using notice evidence for products cases, and notice

9  being information that should draw your attention to

10  something, as opposed to using it substantively to establish

11  a defect.

12        THE COURT:  So there's nothing in the record

13  before me, as it relates to these motions, as to whether

14  Tesla did or didn't use these posts.  So, I mean, that's

15  a -- you know, if that is a factor at trial, you know, we'll

16  figure that out, figure that out at trial.

17        MR. MCDEVITT:  Your Honor, just so that -- I want

18  to make sure I'm not misleading the Court.  I'm not

19  necessarily saying they used exactly these --

20        THE COURT:  No, I understand.  You're saying,

21  "Would go to and look at."

22        MR. MCDEVITT:  Yes, yes.  That's similar to "have

23  read it."  Those are different sources that they went --

24        THE COURT:  User expressions.  I understand that.

25     I think that, for the reasons I've identified, Andre's

71

1  reference to the posts, use of the posts, reliance on the

2  posts in formulating his opinions is acceptable under Rule

3  703, and he can say, "I went to a post," and he can

4  identify, "I was looking at posts of Tesla users, where

5  they, you know, had issues of mode confusion," or, you know,

6  "were confused as to whether or not autopilot was engaged,"

7  full stop.

8      He's not reading any post to the jury.  The posts are

9  not going to be admitted into evidence.  The jury will not

10  have the posts.  He can refer to them in that form, to that

11  extent, and I'm looking for support of that in his report,

12  and I will -- again, I can only work from the record that's

13  in front of me, so I can only manage the -- manage it from

14  the excerpts that were provided.

15      But that's what he is pointing to for his opinion that

16  Tesla's design produces mode errors and mode confusion, and,

17  you know, he can say, "Yes.  I look at reports, and I saw

18  those."  And then, on cross, he can be challenged as to how

19  substantive, you know, the challenge is to those reports,

20  and what, in fact, they do or do not reveal, in that they're

21  anonymous and on line, et cetera.  Okay.

22          MR. GOLDEN:  The only thing -- and I understand

23  your ruling.  I'm not going to re-argue anything, just to

24  advise the Court that some of these same evidentiary issues

25  will be raised in the motions in limine to the extent that

72

 1  there are these posts or similar evidence is included on an

 2  exhibit list.  So we will be more thoroughly discussing

 3  hearsay issues and all the other reasons --

 4          THE COURT:  To be sure.  To be sure.  That's the

 5  fun of the pre-trial conference, and you all have a lot of

 6  work to do.  I know you have my standing order on civil

 7  trials firmly in mind, but you have to work hard together on

 8  that exhibit list.

 9      I'm not going to get a list of 1,000 pieces of paper,

10  because this trial is not going to be that long.  We're

11  going to -- you will have met and conferred.  You will have

12  come to some agreements as to admissibility or authenticity,

13  I hope, and, you know, we're going to get this down to a

14  very efficient status that we can get this to the jury and

15  get it before it appropriately.

16      But yes, I understand some of these issues, and my

17  rulings -- that's why I want to get you these rulings

18  sufficiently in advance.  I think they will help to inform

19  you.  So, yes, let's not re-argue today's positions once we

20  get to the pre-trial, when you know how it's going to come

21  out.

22          MR. GOLDEN:  Just one quick clarification, and

23  then I think Ms. Darrell has a question about the pre-trial

24  order, if it's okay for her to speak.  These are in limine

25  rulings, so we can always maybe ask you to revisit them,

73

1  depending upon what happens in trial, like any in limine

2  ruling.

3         THE COURT:  Well, <u>Daubert</u> rulings --

4         MR. GOLDEN:  (Indiscernible.)

5         THE COURT:  I mean, you know, if the underlying

6  facts supporting my rulings change --

7         MR. GOLDEN:  Yes, and that's -- I'm not saying

8  we're going to re-file the same motion during trial.

9         THE COURT:  There's a reason I limit in limine

10 motions to five, to be candid, because I want you to really

11 focus on what are the -- you know, what are the categories

12 of evidence that make a difference?

13    I cringe -- I didn't like it when I was a litigator,

14 and I really don't like it as a judge, when I get a motion

15 in limine to exclude evidence that wasn't produced in

16 discovery.  Are you kidding me?  That's in the rules.  We

17 don't need a motion for that, unless there's a very specific

18 issue.

19    You know, some cases, there's something unique, but

20 resist that.  It really is for, you know, "Here's what has

21 come up in the course of discovery, and, you know, we need

22 guidance from."  I do it in a chart form.  You know, I

23 manage those motions in a chart.  You're going to get my

24 ruling in a chart.  You know, it's short and sweet and to

25 the point.

74

1          Ms. Darrell, did you have a -- well, let me just
2   say, I'm going to take a few minutes, a five-, 10-minute
3   recess.  I just want to go over my notes and make sure we're
4   set, here.
5        Is our 12:00 o'clock here, Ms. Gampart, or have you
6   heard?
7               THE CLERK:  They're ready.
8               THE COURT:  Okay.  They're going to wait until
9   we'll done.  It will be about 15 minutes, and we'll be all
10  done.
11       But, before I take my recess, a question, Ms. Darrell?
12              MS. DARRELL:  Yes, your Honor.  I'm just seeking
13  some clarification on the pre-trial order that
14  (indiscernible), your standing order.  So the pre-trial
15  conference is set for October 24, and under your standing
16  order, that would mean most of our pre-trial filings are due
17  October 10, which is 14 days before that.
18              THE COURT:  Right.  I gave you some different
19  dates, though.
20              MS. DARRELL:  You did, and that's what I need some
21  clarification on, and, also -- and I have conferred with Mr.
22  McDevitt about this -- we would ask that that date be moved
23  to October 10, if possible.
24              THE COURT:  I'm looking for my -- wait.  Ms.
25  Gampart already printed it out for me.  I knew this would

75

1  come up.

2          MS. DARRELL:  It was September 26th and October

3  3rd.

4          THE COURT:  Right.

5          MS. DARRELL:  I think, given the number of issues

6  kind of still outstanding, and the amount of work that we

7  need to do in this case, the parties could greatly benefit,

8  and we jointly agree on this, in having October 10 be the

9  deadline, which is the default from the standing order.

10          THE COURT:  For pre-trial filings?

11          MS. DARRELL:  Yes, for the pre-trial filings

12  outlined in the standing order.

13          THE COURT:  Okay.  So the reason I advanced your

14  pre-trial filing date is for just the reason you've

15  identified, which -- I think that there may be a number of

16  issues.  I'm sort of anticipating there may be a number of

17  issues, and I'd rather that we get to them sooner, so that

18  we have more lead-up time to work through those, and can get

19  things addressed at the pre-trial, which is bumping up

20  against our trial date.

21          MS. DARRELL:  Yes.

22          THE COURT:  So, because those will come in, and

23  I'll be looking at them, and sometimes I can it's like, "No,

24  I need" -- "The parties need to do another round," or

25  something, and I may issue an interim order.

76

1          MS. DARRELL:  So, your Honor, I think I also
2     then -- I think we would just ask for clarification on the
3     September 26th and October 3rd.  It seems to be most of the
4     pre-trial deadlines and the standing order are just one
5     date, 14 days before the pre-trial conference, and so I
6     wasn't sure what the two dates were for, and, if possible,
7     if we could have the October 3rd date then be a date --
8          THE COURT:  Right.  So the -- I think this part is
9     pretty clear in my order, but I will step back and take a
10    look at it.  But you have to -- your motions in limine, for
11    example, are due on the 26th, and then any oppositions to
12    that would be due on the 3rd, and I forget how I handled the
13    exhibits, but, you know, there's quite a lot that's due on
14    the 26th.  But, to be honest, I have to step back and look
15    at my order.
16         MS. DARRELL:  So, your Honor, there is a -- the
17    parties must file, like, a joint pre-trial statement, and
18    that is the one that's 14 days before, and that one is the
19    one I have quite a bit in it.
20         THE COURT:  Right, and that's the 26th.
21         MS. DARRELL:  That we would ask for at least the
22    3rd.  I think the parties would jointly benefit from a
23    little bit more time, especially given a lot of what may be
24    in dispute depends on the choice of law analysis.
25         THE COURT:  Which you're going to have within the

77

1    week.

2              MS. DARRELL:  Okay.  That's still only going to be

3    a couple of weeks.  It's a lot -- I think (indiscernible).

4              THE COURT:  (Indiscernible) big list, no doubt

5    about it.

6              MS. DARRELL:  And I think it would be a -- we

7    would benefit to at least have October 3rd.  I think our

8    submission --

9              THE COURT:  I appreciate that, but it's not just

10   your benefit.

11             MS. DARRELL:  Yes, I understand that, your Honor.

12             THE COURT:  I need the time, and we've got our

13   pre-trial on the 24th.  Now, I can keep the 3rd and the

14   10th, but that only gives you a week to respond to filings,

15   and that still gives me two weeks before the pre-trial.  I

16   know why, also, I moved it up, is I'm going to miss that

17   date.  Yes.  Well, I will -- I hear the request.  I will

18   consider it.  I'll let you know.

19             MS. DARRELL:  One other request, your Honor.  The

20   exhibits themselves, which is a different deadline, five

21   days before, the Court has asked for paper copies.  There

22   are a lot of potential exhibits in this case.  Quite a lot

23   of documents were exchanged in discovery, thousands.  I

24   don't know that all thousands and thousands would be on our

25   list.

1      THE COURT:  No.  I can tell you right now, your

2 exhibit list is going to take the most work and time, on

3 both sides, because you're going to roll up your sleeves,

4 and it's going to be the real exhibit list.  I don't want

5 the "We're preserving everything possible, any time of day"

6 exhibit list.

7      You've got to get ready for trial.  You've got to get

8 this case focused and narrowed down, and you know what's so

9 difficult for the Court is, you all know exactly which

10 exhibits you're -- you have your A list, and then you've got

11 your, you know, universe and B list, but you know exactly

12 what's on that A list, and that's the list I want.

13      MS. DARRELL:  Okay.  And I understand that and

14 appreciate that, your Honor.  We'd just request that

15 possibly we could submit the actual exhibits electronically,

16 and then provide paper copies to the Court the morning of

17 trial.

18      THE COURT:  We'll see.  I have to be able to work

19 through them, so we'll see.

20      MS. DARRELL:  Okay.  Thank you, your Honor.

21      THE COURT:  Okay.  All right.  Your requests are

22 noted.  Thank you.

23      We're going to take a five-minute recess.  Ms.

24 Gampart, if you'll check with me in five.  I just want to go

25 over a few notes.

1    Let me circle back, though.  Mr. Golden, you had

2  referred to supplemental briefing, not a topic near and dear

3  to my heart, but tell me what it is you were concerned

4  about.  Is it on choice of law as it relates to other

5  issues?

6         MR. GOLDEN:  Yes. It would just be other issues

7  that remain, and that will in turn depend upon how your

8  Honor rules with regard to what was characterized as my

9  "broad request."  (Indiscernible.)  I don't think it was

10  broad, but, be that as it may, if your Honor would prefer to

11  do it in some other fashion, that's fine, but the rule

12  (indiscernible) and choice of law issues remain no matter

13  how your Honor rules on the motion, like, for example, with

14  respect to the recall.

15    So that could part of the motion in limine, but I

16  understand we have 15 pages for all the motions in limine.

17  So, however your Honor thinks best, we will proceed that

18  way, but yes, my thinking for the supplemental briefing

19  would just be for whatever other choice of law issues

20  remain.  It wouldn't be --

21         THE COURT:  And do you have any idea how many -- I

22  mean, have you thought about those, and thought about what

23  they are?

24         MR. GOLDEN:  I think, if your Honor agrees with

25  me, there is very little that's left, but, if your Honor

80

just sticks to the narrow four ones that were specifically

outlined, there may be (indiscernible) more, because we

would need to, for example, brief the loss of consortium

cause of action, is just one thing.

THE COURT:  And why do you think those haven't

been waived, since I had the -- we've had a hearing on

choice of law, and you raised issues.

MR. GOLDEN:  We raised having Virginia substantive

law apply to everything --

THE COURT:  Which California does not allow.

MR. GOLDEN:  Which you denied our request, but I

don't think we waived it, because we made the request in our

motion.

THE COURT:  California law just doesn't allow me

to do that.  Okay.  I hear you.

All right.  Five minutes.  Check with me, Ms.

Gampart.  It might be 10 at the outside.  I've got grand

jury people waiting.  So we'll be in recess.  Please remain

seated.

(Proceedings recessed briefly.)

THE CLERK:  We're back.

THE COURT:  Okay.  All right. I have reviewed.  I

don't have any further questions at this time.  I'm not

going to request any further briefing at this time, and I'm

not going to make any adjustments to the pre-trial schedule

81

1 at this time.  But I do hear the requests.  I will -- let me

2 get these orders pulled together.  I want to get you these

3 next week, and so you'll have those in hand, and I will look

4 at the schedule.  If there's any room for adjustment, I'll

5 make it, but I heard the requests.  I'm not sure I can

6 accommodate that.

7          Anything else for the Court today?  From

8 Plaintiff?

9          MR. MCDEVITT:  No, your Honor.  Thank you.

10          THE COURT:  Okay.  And from Defendant?

11          MS. DARRELL:  No, your Honor.

12          MR. GOLDEN:  Nothing further from us, your Honor.

13          THE COURT:  Okay.  I want to thank both sides for

14 your preparation for today.  It was very helpful, and I

15 appreciate that.  So this matter is concluded, and we are

16 adjourned, and I'm not going to leave the bench because I've

17 got other folks out in the hallway.  But the courtroom will

18 be sealed, so you'll need to excuse yourselves.

19          MS. DARRELL:  Need to get out of here.  Thank you,

20 your Honor.

21          THE COURT:  Thank you.

22          MR. GOLDEN:  Thank you, your Honor.

23      (Proceedings adjourned at 12:16 p.m.)

24

25

82

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3    I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9    I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17    Echo Reporting, Inc., Transcriber

18       Friday, September 6, 2024

19

20

21

22

23

24

25